IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Case No. 16-21620-CMB |
| THE LIQUIDATING ESTATE OF H&P, | : | |
| INC., f/k/a HEYL & PATTERSON, INC., | : | Chapter 11 |
| *Debtor* | : | |
| | : | |
| ALBERT'S CAPITAL SERVICES, | : | Adv. No. 18-2045-CMB |
| LLC, PLAN ADMINISTRATOR | : | |
| FOR THE LIQUIDATING ESTATE | : | |
| OF H&P, INC., f/k/a HEYL & | : | |
| PATTERSON, INC., | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| KREITZ MOTOR EXPRESS, INC., | : | |
| t/d/b/a K.M.X. INC. AND KRIETZ | : | |
| MOTOR EXPRESS, INC., t/d/b/a | : | |
| K.M.X. INTERNATIONAL, | : | |
| *Defendant* | : | |

_____

| | | |
|---|---|---|
| ALBERT'S CAPITAL SERVICES, | : | Adv. No. 18-2046-CMB |
| LLC, PLAN ADMINISTRATOR | : | |
| FOR THE LIQUIDATING ESTATE | : | |
| OF H&P, INC., f/k/a HEYL & | : | |
| PATTERSON, INC., | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| CUSTOM FABRICATIONS, INC., | : | |
| *Defendant* | : | |

1

### *Memorandum Opinion*

These are two preference avoidance actions pursuant to *11 U.S.C. §547(b)* that were filed by Albert's Capital Services, LLC ("Albert's Capital" or "Plaintiff") in its capacity as the Plan Administrator for the Liquidating Estate of Debtor Heyl & Patterson, Inc. ("H&P" or "Debtor"). The Defendants, Kreitz Motor Express, Inc. t/d/b/a K.M.X. Inc. and Krietz Motor Express, Inc. t/d/b/a K.M.X. International (collectively, "KMX") in Adv. No. 18-2045, and Custom Fabrications, Inc. ("Custom," and together with KMX "the Defendants")[1] in Adv. No. 18-2046, are unrelated, but are represented by the same law firm. The two cases were tried together on January 10-11, 2023 with the consent of all Parties. At issue are prepetition payments from the Debtor to KMX totaling $592,194.29, and from the Debtor to Custom totaling $513,866.50. For the reasons explained below, the Court finds that Plaintiff has proven avoidable preferential transfers to KMX in the amount of $116,734.90 and to Custom in the amount of $40,347.90.[2]

### *Background and Procedural History*

H&P filed a voluntary Chapter 11 petition on April 29, 2016. H&P's initial intent was to continue its operations as a debtor-in-possession and to use the bankruptcy process as a means

---

[1]

The identification of the Parties in the caption and within this Memorandum Opinion and accompanying Judgment Order reflects the names as set forth in the captions of the complaints commencing these proceedings.

[2]

The Court has jurisdiction to hear and decide these adversary proceedings pursuant to *28 U.S.C. §§157* and *1334*. These adversary proceedings are core matters pursuant to *28 U.S.C. §§157(b)(2)(B), (F)*, and *(K)*. This Memorandum Opinion represents the Court's findings of fact and conclusions of law under *Fed.R.Bankr.P. 7052*.

of reorganizing. *See* Declaration of John R. Edelman, Main Case Doc. No. 19 at ¶13. Reorganization efforts proved unsuccessful, however, and as a result H&P switched tactics to a sale of substantially all of its assets which was approved by the Court on December 8, 2016. *See* Main Case Doc. Nos. 346, 347.

On April 28, 2017, a Joint Plan of Liquidation ("Plan") was filed by H&P and the Official Committee of Unsecured Creditors, and it was confirmed by the Court on August 14, 2017. *See* Main Case Doc. Nos. 506, 576. Under the Plan, Albert's Capital was appointed as Plan Administrator with a role, among other things, to pursue, settle or abandon all remaining causes of action of the Liquidating Estate. *See, generally*, Plan Administrator Agreement at Sections 4.03, 7.01, and 8.01(4) attached as Exhibit 1 to the Confirmation Order. The Plan Administrator is also authorized to file objections to any Claims filed in the bankruptcy case. *Id.* at Sections 5.06 and 6.01.

Both of the adversary proceedings at issue here were filed on March 29, 2018, and both involve preference action claims for payments made to the Defendants by H&P in the 90-day period preceding the bankruptcy filing.[3]   The two adversaries have for the most part proceeded in close tandem.

As was mentioned above, a trial was held over the course of two days in January.  The Plaintiff introduced 63 Exhibits into evidence, comprising more than 1400 pages of documents, and

---

[3]

The complaints filed in both of the adversary proceedings also included separate counts with an alternative claim of fraudulent transfer (Count II), but these were withdrawn on January 5, 2022. In addition, in Adv. No. 18-2045, the Defendant KMX asserted a counterclaim which was withdrawn as provided in the Order entered January 15, 2019. The complaints also included a request for disallowance of claims pursuant to 11 U.S.C. §502(d) (Count III) and an objection to claim (Count IV). It does not appear that either of these claims was specifically addressed in the Joint Pretrial Statement, argument or evidence at trial, or in the post-trial filings. Therefore, the Court finds that these other claims have been waived and/or abandoned.

then immediately rested, without calling any witnesses. In their case, the Defendants called the

following as witnesses: John Edelman ("Edelman"), the former majority owner and CEO of the

Debtor;  Mary Holste ("Holste"), the former controller of the Debtor;  Raymond Shore ("Shore"),

the former supervisor of project managers for the Debtor;  Leonard Walnoha ("Walnoha")[4], the

former operations manager for the Debtor; James Vitez ("Vitez"), the owner of KMX; and Jeff Cook

("Cook"), the owner of Custom. Defendants also introduced a number of Exhibits into evidence.

Following the trial the Parties submitted briefs and proposed findings of fact and conclusions of law.

*Facts*

In the Joint Stipulation of Facts and Statement of Facts in Dispute ("Joint

Stipulation") filed by the Parties at Doc. No. 302 in Adv. No. 18-2045 and at Doc. No. 269 in Adv.

No. 18-2046,[5] they agreed on a number of facts that are significant to the Court's decision.  Drawing

on both the Joint Stipulation and the evidence that was presented by the Parties at trial, the Court

makes the findings of fact that follow.

Until 2016, H&P was a firm based in Pittsburgh that was in the business of producing

and selling industrial machinery, including for the bulk transfer of materials related to energy

production, such as rail car and barge unloaders.  H&P's manner of operating was to bid the technical

---

[4]

Walnoha was ill at the time of trial and therefore not available for testimony. With Plaintiff's consent, the Defendants relied on his discovery deposition transcript, which was among a number of deposition transcripts included in Plaintiff's Exhibits, and read excerpts from it into the record.

[5]

The two documents are very similar but do contain a number of differences that reflect relevant facts specific to each of the cases. Notably, the filings also contain *disputed* facts. In the post-trial filings, it is insufficient for the Parties to rely on the *disputed* facts within these documents as the sole support for proposed findings of fact. *See, e.g.,* Adv. No. 18-2045, Doc. No. 338-1 at ¶98.

applications, create the engineering, and subcontract vendors and subcontractors to obtain the parts, equipment, components and other services, including steel fabrication and logistical services.

On December 10, 2014, H&P entered into a contract with Mitsui Miike Machinery Co., Ltd. ("MMM" and "the MMM Contract") in connection with the design and construction of an automated coal loading facility in far eastern Russia (the "MMM Project" or "Project") that would provide for the unloading of coal from rail cars into a yard for subsequent loading onto freighter ships. When completed, the equipment that H&P would be designing was to be shipped for use at Vostochny Port in Russia. Within the MMM Contract, the Marubeni Corporation is identified as both "Shipper" and "Customer," while the "Final Customer" is defined as Vostochny Port.

The MMM Contract set a total contract price to be paid to H&P of $8 million, with $7,908,150 representing payment for the equipment to be manufactured and its delivery to Russia, and the small remainder representing on-site supervision services that H&P would provide during installation of the equipment in Russia. The equipment portion of the MMM Contract was to be paid out in percentage-based installments as specific performance milestones were met by H&P. For example, 5% of the contract price was due within 30 days after the arrival in MMM's office of an original invoice issued by H&P after signing the contract, another 5% was due within 30 days after the arrival in MMM's office of an invoice from H&P after the receipt by MMM of approved project drawings, another 1% was due within 30 days after the arrival in MMM's office of an invoice from H&P after MMM received technical documents required for declaration of conformity with Russian Customs Union certificate, etc. There were 13 such milestones set forth in the MMM Contract. *See* Plaintiff Exhibit 1 at Section 3.1(a) - (m).

After the MMM Contract was signed, H&P then contracted with multiple

subcontractors and vendors for the goods and services necessary for it to fulfill the Contract. One

of those subcontractors was Custom, a steel fabrication company located in Plant City, Florida. In

the spring of 2015, H&P began requesting quotes, issuing purchase orders, and exchanging

drawings with Custom regarding the fabrication of steel components needed for the MMM Project.

Custom and H&P never entered into an overall stand-alone contract document, but in June 2015,

Custom began fabrication and construction of steel components pursuant to H&P's purchase orders,

including Purchase Orders 9398, 9900, 9944, and 9953. H&P had not previously dealt with

Custom.

Custom would periodically submit invoices to H&P for the work Custom performed.

Each Invoice contained an Invoice Number, the date of issuance, the applicable H&P Purchase

Order Number, the amount due, and the term "Net 30," meaning that payment on the invoice was

due 30 days after the invoice was issued. The invoices issued by Custom that are at issue in the

present case are only those that resulted in payment to Custom occurring during the 90 days

preceding the bankruptcy filing, and these will be referred to as the "Custom Invoices." The

following Chart 1 summarizes the Custom Invoices:

*Chart 1- Custom Invoices*

| Invoice No. | Amount | Issue Date | Due Date |
|---|---|---|---|
| 3441 | $ 15,500 | Dec. 22, 2015 | Jan. 21, 2016 |
| 3447 | $ 7,005 | Jan, 15, 2016 | Feb. 14, 2016 |
| 3457 | $163,828.50 | Jan. 29, 2016 | Feb. 28, 2016 |
| 3468 | $ 69,750 | Feb. 23, 2016 | Mar. 24, 2016 |
| 3469 | $    740 | Feb. 19, 2016 | Mar. 20, 2016 |
| 3478 | $104,387 | Mar. 10, 2016 | Apr. 9, 2016 |

| 3481 | $ 69,750 | Mar. 21, 2016 | Apr. 20, 2016 |
| 3484 | $ 82,906 | Mar. 31, 2016 | Apr. 30, 2016 |

On February 4, 2016, H&P paid Custom $15,500.00  for Invoice 3441 with unrestricted funds from H&P's bank account.   H&P did not make any other payments to Custom in February 2016 or March 2016, or the first half of April 2016.   By April 17, 2016, the remaining Custom Invoices as noted in the above Chart 1 were all overdue and H&P had not paid any of them. Thus, as of April 18, 2016, Custom was a creditor of H&P for goods which it had fabricated to completion, as reflected in the unpaid Custom Invoices. On April 18, 2016, H&P wired a total amount of $498,366.50 to Custom on account of the unpaid Custom Invoices.  The source and circumstances surrounding that April 18th payment are important and will be discussed below.  The total amount of payments to Custom at issue is thus $513,866.50.

In November 2015, H&P began negotiations with KMX for a contract under which KMX would provide logistical and warehousing services for the MMM Project.   That is to say, KMX's function would be to pick up the various components that were being manufactured for the MMM Project by H&P subcontractors, transport them to a central KMX warehouse location in or near Houston,  and prepare them for shipping to Russia.  On January 26, 2016, KMX and H&P reached an agreement and signed a contract (the "KMX Subcontract").

There was a payment schedule in the KMX Subcontract that specified when KMX would issue invoices to H&P, and when payment on them by H&P  would be due.  Based upon the Joint Stipulation and Plaintiff's Exhibit 28, the following Chart 2 summarizes the "KMX Invoices" that were issued pursuant to the KMX Subcontract:

*Chart 2- KMX Invoices*[6]

| Invoice No. | Amount | Issue Date | Due Date |
|---|---|---|---|
| 9706 | $ 51,000 | Jan. 28, 2016 | Feb. 15, 2016 |
| 9762 | $ 40,887 | Jan. 29, 2016 | Mar. 11, 2016 |
| 9776 | $149,270 | Feb. 5, 2016 | Mar. 18, 2016 |
| 9804 | $40,887 | Feb. 9, 2016 | Upon Receipt |
| 9816 | $115,522 | Feb. 12, 2016 | Mar. 25, 2016 |
| 9822 | $ 26,609 | Feb. 18, 2016 | Apr. 1, 2016 |
| 9838 | $126,712 | Feb. 25, 2016 | Apr. 7, 2016 |
| 9871 | $ 2,719 | Mar. 4, 2016 | Mar. 18, 2016 |
| 9881(A) | $ 10,124.40 | Mar. 11, 2016 | Mar. 25, 2016 |
| 9935 | $ 13,114.91 | Mar. 11, 2016 | Apr. 10, 2016 |
| 9921 | $ 41,002.07 | Apr. 1, 2016 | Apr. 14, 2016 |
| 9936 | $ 13,114.91 | Apr. 11, 2016 | May 10, 2016 |

KMX Invoice No. 9706 was paid by H&P by wire transfer in the sum of $51,000.00 to KMX on or about February 12, 2016. Invoice Number 9762 was paid by H&P by wire transfer in the sum of $40,887.00 to KMX on or about March 11, 2016.   No further payments on any of the KMX Invoices were made by H&P to KMX until April 18, 2016 when  H&P wired $500,307.29 to KMX.  The total amount of payments to KMX at issue is thus $592,194.29.

---

[6]

The Court reviewed the invoices in Plaintiff's Exhibit 28 together with the Joint Stipulation. It is noted that the Parties stipulated that Invoice No. 9804 was in the amount of $40,887, but the invoice itself only appears to be for $250. *See* Plaintiff Exhibit 28 at Bates No. 374. The Joint Stipulation also provides the following clarification regarding Invoice Nos. 9935 and 9936: The charges shown on Invoice Nos. 9935 and  9936 were  for storage charges at the rate of $6,000.00 per month and accrued interest on the unpaid balances due on all invoices and change orders issued after January 29, 2016 at the rate of 18% per annum. Ultimately, this makes no difference in the Court's decision which focuses on the payments actually made by Debtor.

Now that the basic invoicing and payment history involving the H&P subcontracts with Custom and KMX has been summarized, attention can turn to the financial difficulties of H&P that led to the missed payments discussed above, the responses by Custom and KMX , and H&P's efforts to rectify the situation by seeking funds from MMM to pay them.

Almost from the inception of the MMM Contract, H&P experienced cash flow problems that made it difficult for H&P to pay its subcontractors on time.  This persisted throughout 2015 and into 2016. For instance, in July 2015 Custom communicated with H&P about an outstanding invoice that was overdue for payment and H&P responded by pointing to a "short term liquidity situation" it was facing and thanking Custom for its  patience and understanding.  *See* Defendants' Exhibit O.  In H&P's view, its ongoing cash flow problems were attributable primarily to the payment milestones under the MMM Contract,  which H&P did not believe were providing ongoing payments commensurate with the actual progress on the MMM Project.  By September 2015 subcontractors on the Project were threatening H&P that they would withhold further performance unless they received timely payment,  and  H&P began making efforts to renegotiate the payment milestone schedule with MMM under the MMM Contract and arguing that completion of the Project could be jeopardized if that were not done.  *See, e.g.,* Defendants' Exhibit T.  MMM did not initially respond to H&P's entreaties. Eventually, in late 2015, an agreement was reached to change some of the payment milestones so as to get money to H&P sooner, but with all other provisions of the MMM Contract to remain the same.

This may have provided some temporary relief,  but H&P was unable to meet the reset performance milestones in the late 2015 agreement. Its cash flow problems continued into the year 2016. In late January 2016, a representative of MMM traveled to the H&P office in Pittsburgh

9

for a meeting during which Edelman presented a proposal for a second alteration of the payment milestone terms under the MMM Contract. MMM did not agree to such proposal. H&P began missing invoice payments to subcontractors, and in particular to Custom and KMX as was described above.

H&P was also faced at this time with terms of the MMM Contract which provided that H&P was to complete total delivery of the equipment it was to provide by February 29, 2016, and would be required to pay liquidated damages to MMM if it failed to do so. As this date approached and passed without H&P having completed delivery, H&P became concerned about the liquidated damages it might be facing.

Throughout March and early-April 2016, Vitez of KMX spoke with various people at H&P about the need to receive payment on outstanding invoices. There were also e-mail exchanges between Edelman and Vitez during this period in which KMX expressed its displeasure at not being paid and raised the possibility that "[a] warehouseman's lien can be placed on the cargo held in Texas, but to date has not been done." Defendants' Exhibit OO. Vitez indicated a willingness to attend a meeting with Edelman and a representative of MMM for the purpose of trying to convince MMM to another change in the payment milestone terms under the MMM Contract. Edelman was of the view that a threatened "closure" of the warehouse by KMX, *i.e.*, a denial of access to either H&P or MMM, might help MMM to understand the seriousness of the situation and the need for MMM to provide additional funds. A meeting involving Edelman, Vitez, and an MMM representative was held in Houston in late March 2016, but no agreement on additional funding was reached. It appears that H&P and MMM, however, continued to talk thereafter about a possible resolution.

10

In addition to KMX, Custom was also communicating with H&P around this same time period concerning H&P's failure to pay Custom's invoices. Custom had previously been arranging for the shipping of goods to the KMX warehouse as they were completed, but it now informed H&P that it was going to stop any further shipments of goods to KMX until it was paid. Custom also informed H&P on April 12, 2016 by e-mail that Cook had been contacted by an MMM representative who was inquiring about the status of Custom's work and the remaining balance owed to Custom. Cook credibly testified at trial that the MMM representative had indicated to him that there was a possibility that MMM might have to pay Custom. Cook informed H&P that Custom was temporarily holding off on providing MMM the requested information, but that the matter was very serious and if full payment from H&P was not received within 24 hours it would do so. H&P, through Shore, responded by informing Cook that H&P was working toward a "3rd party check" from MMM and asked that Custom work through H&P rather than with MMM. Cook also spoke with Vitez about the possibility of retrieving some of the items that Custom had previously shipped to KMX because of H&P's failure to pay, and Vitez assured Cook he would not allow the goods to go anywhere unless Custom and KMX were both paid.

On April 12th Vitez also sent a letter to Edelman advising him that MMM was seeking information about outstanding payments owed to KMX. Vitez said he was giving H&P "one last opportunity to resolve this matter" by contacting KMX that day to assure it would pay all outstanding invoices and then making the payment by the next day. Having not received a satisfactory response to this letter, on April 15th Vitez then informed H&P that it was "closing" its warehouse by denying access to H&P and MMM until it was paid under the KMX Subcontract. Walnoha responded to that and informed Vitez by e-mail that KMX would be paid by Monday (April 18th) and that "[t]he $ will

flow directly through HP to you" to allay concerns that KMX had expressed about the possibility that a payment from H&P could be subject to a "clawback" in a bankruptcy.

By Friday, April 15, 2016, H&P was in a crisis situation. Two key subcontractors, Custom and KMX, were refusing to do any further work on the Project until they were paid, and both had discussions with MMM about a possible direct payment from MMM. H&P did not have the money to pay them and did not have any right to further payment from MMM under the MMM Contract because the next payment milestone had not been met. As indicated previously, H&P was continuing to talk with MMM seeking a solution. On the morning of April 13th Shore sent an e-mail to a representative of Marubeni summarizing the situation and explaining that H&P needed additional funding because "[i]f this amount [owed to Custom and KMX] was to come from our contract with MMM it would have to come from the next milestone which occurs after installation–likely over a year from now." The Marubeni representative sent a responsive e-mail to Shore later that day indicating that MMM was ready to consider additional advance payment, but that, in order to move forward, MMM was sending representatives to the United States to meet with H&P.

Discussions continued over the weekend. On April 17, 2016 at 6:12 A.M., MMM e-mailed a proposed letter agreement to Walnoha that would have provided for an adjustment in the MMM Contract payment milestone schedule. The proposal would allow H&P to receive an additional 12% payment under the Contract ($948,978) by April 18th, with a promise by H&P to promptly use those funds to pay subcontractors that had suspended their performance and to get a pledge from them that they would immediately resume work once paid. MMM requested that Walnoha sign the letter agreement on behalf of H&P and return it as soon as possible.

Walnoha forwarded this information to Edelman by e-mails sent at 8:53 A.M and 9:17 A.M on April 17th. He noted that "[w]e could refuse to sign and risk holding up payments til resolved. We could say we will only sign if MMM adds a statement that no LDs [liquidated damages] will be enforced. Or we can sign and certainly give the LDs." Defendants' Exhibit UUU. Edelman responded to Walnoha at 9:24 A.M. on April 17th stating "[m]y opinion is to confront on LD's. We have arguments that his behavior caused delay. They need the stuff." *Id.*

Walnoha electronically signed the proposed letter agreement from MMM, but also added the following language to it:

> In consideration of H&P signing this agreement, MMM agrees to waive any claim to, and not apply, any and all Liquidated Damages associated with this contract.

Exhibit NNNNNN at Bates No. 544. This document was then e-mailed by Walnoha to the MMM representative on April 17th. *See* Exhibit VVV.[7] The e-mail noted the additional language that had been added and requested a copy signed by MMM. The MMM representative responded in an e-mail to Walnoha stating that "[t]his is not negotiable at all fundamentally." *Id.* Walnoha responded to that in an e-mail stating that "HP does not agree to all the language in your letter. So that the process can move forward as agreed yesterday, HP has added the LD language as a compromise." *Id.* The MMM representative responded to that in an e-mail again stating that the liquidated damages were not negotiable and urging Walnoha to sign the original letter agreement. Walnoha responded in an e-mail reiterating that H&P would not sign the letter as originally written. The MMM representative

---

[7] The exact sent times for this and the following e-mails to be discussed will not be given because there seems to be inconsistencies in the times shown, perhaps caused by the e-mails being sent from different time zones on both sides of the international date line. The e-mails are all from a single "thread," however, and their order can be determined from the position in which they appear in the thread.

then responded in an e-mail that stated in relevant part:

> MMM are ready to make remittance on time as well prepared in Japan.
>
> What MMM must absolutely ensure with the pledge by H&P, are:
>
> 1.  H&P to make sure to pay H&P's Vendors upon receipt of remittance by MMM
>
> 2.  H&P to make sure to have H&P's Vendors terminate work suspension then resume their work immediately
>
> 3.  H&P to make sure to accelerate the progress then achieve earliest shipment ASAP

*Id.* Walnoha responded in an e-mail stating that "HP does pledge to the 3 items in your below email" and that he would plan on picking up the representative at the hotel the next morning. *Id.*

On April 18, 2016, MMM wire transferred $948,978 into H&P's operating bank account at Fifth Third Bank. With an MMM representative present at the H&P office to monitor what was done, H&P then immediately wired $500,307.29 to KMX and $498,366.50 to Custom. These two transfers totaled $998,673.79. The difference between what MMM had transferred in to H&P and what H&P paid out was thus $49,695.79 and that came from unrestricted H&P funds on hand. Custom and KMX resumed work on the Project after receiving the April 18th payments. H&P filed its bankruptcy petition 11 days later.

## *Legal Discussion*

Plaintiff is seeking to recover the payments made to  Custom and KMX as preferences.  The applicable provision in the Bankruptcy Code states:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under

14

subsection (c), avoid any transfer of an interest of the debtor in property--

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*See* 11 U.S.C. § 547(b).  Although there are five subsections in this statute, it is well-recognized that there are actually six elements needed to prove a preference claim, with the other one being the "transfer of an interest of the debtor in property" as found in the introductory paragraph.  *See, e.g.*, *Alderson FCI, FCU v. Burks* (*In re Burks*), No. 1:18-ap-1002, 2022 WL 243929, at *9 (Bankr. S.D. W. Va. Jan. 25, 2022) (identifying the six elements).  Section 547(g) provides that the "trustee" has the burden of proving the avoidability of a transfer under Section 547(b), and the creditor against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under Section 547(c), which sets forth various affirmative defenses or safe harbors that are available.

The present case is somewhat simplified in that the Parties have stipulated that the preference elements set forth in Section 547(b)(1) - (4) have all been met.   There is a dispute as to whether the transfers were of an interest of the Debtor in property and also as to whether the transfers

15

enabled the Defendants to receive more than they would have in a Chapter 7 case. The property

interest issue will be considered first since, if the Debtor had  no property interest in the transferred

funds, there would be no need to go further.

### *(A) Transfer of an interest of the Debtor in property*

It appears that the property interest issue really only involves the payments to Custom

and KMX that were enabled by the April 18th wire transfer from MMM to H&P.  The $15,500

payment made to Custom on February 4, 2016, the $51,000 payment made to KMX on February 12,

2016, the $40,887  payment made to KMX on March 11, 2016, and  $49,695.79 of the April 18,

2016 payment  came from unrestricted funds in a bank  account of H&P.  As to those payments,  the

Defendants did not question or provide any evidence to show  that H&P lacked a property interest

in such funds.  The Court finds that the property interest element has been met as to them.  The status

of the Debtor's interest in the $948,978 transferred from MMM to the Debtor on April 18th was

vigorously challenged by the Defendants, and it remains to be determined.

The Defendants make a number of arguments in support of their contention that the

Debtor did not have a property interest in the funds wired to it by MMM on April 18th.  They assert

that in April 2016, prior to the 18th,  the Debtor lacked the money to pay Custom and KMX with its

own funds, so that any such  payment would need to come from another source.  They further argue

that the Debtor at that time had not earned and had no right to any additional funds under the MMM

Contract because it had only performed  through contract milestone 3.1(h).[8] Defendants specifically

---

[8]

*See* Edelman testimony, Trial Trans. Day 1 at 76:2-14.

contend that, under the original terms of the MMM Contract, the Debtor was entitled to only 41%
of the contract price for equipment, or only $3,242,341.50, though it by then had already received
71%, or $5,614,786.50 (presumably as a result of the late 2015 agreement which had accelerated
payments to the Debtor under the MMM Contract).  Defendants argue that the agreement between
the Debtor and MMM that resulted in the April 18th wire transfer into H&P was not an amendment
of the MMM Contract, but simply an agreement for MMM to advance money so that Custom and
KMX would be paid.  They also point to Debtor's  lack of discretion and control over the use of the
wired funds as evidence that it lacked a property interest in the funds.  In addition to directly
challenging the Debtor's property interest in the wired funds, Defendants also invoke the
"earmarking" doctrine, a judicially created principle that can deny a preference claim when the funds
used by a debtor to pay a creditor were derived from a third party who directed  use of the funds.

Plaintiff counters by arguing that the Debtor did have a property interest in the  wired
funds that it received from MMM on April 18th .  It contends that the mere fact that the transfers to
Custom and KMX were made from the H&P operating account (into which the funds from MMM
had been wired) is sufficient in itself to establish that the transfer was a transfer of an interest of
Debtor's property.  It goes on to argue that the transfer from MMM to the Debtor on April 18th was
a "contract payment" under the MMM Contract, pointing out that the amount of the transfer was
precisely 12% of the total contract price for equipment.[9]  Plaintiff argues that by making the transfer
MMM satisfied its contractual payment obligation to H&P.  Plaintiff also asserts that the earmarking
doctrine has no application in this case because it requires that the third party providing the funds

---

[9]

The total MMM Contract price for equipment was $7,908,150, 12% of which would be $948,978,
the exact amount wired to H&P by MMM on April 18th.

for payment to existing creditors must itself be a new creditor and there was no evidence presented

to show that MMM was acting as a lender when it wired the funds to H&P.

      The Bankruptcy Code itself has no definition to help illuminate the meaning of the

phrase "transfer of an interest of the debtor in property" as found in Section 547(b).   In general,

bankruptcy courts must look to state law to determine whether a debtor has a property interest.   As

stated by the Supreme Court:

> Property interests are created and defined by state law. Unless some federal
> interest requires a different result, there is no reason why such interests should
> be analyzed differently simply because an interested party is involved in a
> bankruptcy proceeding.

*Butner v. United States*, 440 U.S. 48, 55 (1979).  The Parties have not pointed to any federal interest

involved in the present case that should cause a deviation from this general rule, nor does the Court

itself perceive any.   Therefore, the Court will proceed to analyze the nature of H&P's property

interest in the transferred funds under Pennsylvania law, the state where H&P's office was located

and where the  transfers to Custom and KMX originated.

      As an initial step in this analysis, the applicable burden of proof must be determined.

It was previously noted that the Plaintiff bears the burden of proof to establish all of the elements

of a preference action, which would include the burden to show that the allegedly preferential

transfer was a transfer of an interest of the Debtor in property.   There is case law support for the view

that "bank accounts under the legal title of the debtor, as well as any deposits in such accounts

credited to the debtor, are presumptively considered property of the debtor's estate."   *See, e.g., FBI*

*Wind Down Inc. Liquidating Tr. v. All Am. Poly Corp.* (*In re FBI Wind Down, Inc.*), 581 B.R. 116,

130-31 (Bankr. D. Del. 2018).  Thus, if a preference plaintiff establishes that a challenged transfer

18

was made from a debtor-owned account over which the debtor normally exercised control it "makes

a preliminary showing of an avoidable transfer 'of an interest of the debtor' under §547(b)."

*Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 400-01 (3d Cir. 2009).

The Plaintiff in the present case has shown that the April 18th transfers to Custom and KMX were

made from an account owned by H&P, and over which it normally exercised control. The Plaintiff

has therefore made a preliminary showing on the property interest preference element and the burden

shifts to the Defendants to show otherwise. The Court concludes that the Defendants have met this

burden, though as will be explained below, ultimately for a reason somewhat different than the ones

raised by the Parties.

Based on the amount of time spent by the Parties in their filings and at trial wrangling

over the question of whether the agreement between H&P and MMM that resulted in MMM's April

18th wire fund transfer into H&P was an amendment of the MMM Contract, or something else, they

appear to believe the answer to be critical, if not dispositive, on the property interest issue. It is a

close question, and the Plaintiff does have some good arguments as to why an amendment to the

MMM Contract should be found. For example, the prior adjustment to the payment schedule that

occurred in late 2015 appears to have been done via an amendment to the MMM Contract, and the

fact that the funds advanced on April 18th were exactly 12% of the Contract price would suggest

another amendment was contemplated. It was also apparent that it was important to Edelman for his

own reasons to view what happened as an amendment to the MMM Contract, and he testified

recalling that an invoice under the MMM Contract was prepared in connection with the transfer

though the Court does not find his recollection on this particular point credible.

Nevertheless, the Court believes the Defendants have the stronger argument for several

reasons.  First, it is clear that the letter agreement proposed by MMM (which includes the language

"the amendment of the Contract based on this request") was never implemented because the Parties

did not agree due to the additional liquidated damage waiver language that H&P sought. Second,

regardless of what may have been envisioned in the various proposals that were floated by H&P in

the period leading up to the April 15th weekend events, Edelman stated in deposition testimony

introduced at trial that "[t]he actual resolution wasn't an acceptance of my proposal.  It was

whatever, in fact, happened in those wires preceding the bankruptcy." Third, and perhaps most

significantly,  in order to resolve a pending motion in limine the Parties entered into a stipulation,

approved by the Court,  that provided, among other things, that the Plaintiff would "not prosecute

the action against either Defendant, either as part of Plaintiff's case in chief or in response and

rebuttal to defendant's affirmative defenses, on the basis that the contract between H&P and MMM

was amended as to any terms."  *See* Doc. No. 250 in Adv. No. 18-2046 and Doc. No. 282 in Adv.

No. 18-2045.

      Ultimately, the credible evidence presented at trial established two unassailable facts.

First, until said agreement was reached, H&P had no right at the time to receive any further payment

by MMM under the MMM Contract, because it had not reached a payment milestone requiring such

payment. Consequently, MMM voluntarily agreed to make the April 18th payment and could have

alternatively chosen not to do so without violating the MMM Contract. Second, it is clear that, in

agreeing to make the payment to H&P, MMM would only do so by imposing  explicit conditions on

its subsequent use by H&P, conditions which H&P agreed to and carried out.

      The first of these facts is established by the very nature of the interactions between

H&P and MMM in the March through mid-April time period.  There is absolutely no indication in

the record that H&P ever took the position that it was currently owed money under the MMM

Contract which MMM was wrongfully withholding. Rather, H&P's actions and words demonstrated

a recognition that a change in the status quo on payments was needed, and that MMM was under no

obligation to go along with such request and could have refused.[10]  The second  fact is established

by the e-mail exchanges between H&P and MMM leading up to the transfer, as well as by the trial

testimony of Edelman:

> Q.  ...It's your testimony that MMM provided the money for the sole purpose of paying
> K.M.X. and Custom, that's what you just told me?
>
> A.    That's my recollection.
>
> Q.  All right.  And H&P didn't have the discretion to use the money for some other purpose
> pursuant to your agreement with MMM, correct?
>
> A.  Yeah, and that was Ohno's [MMM representative] purpose in being present.
>
> Q.  And you anticipate my next question.  Mr. Ohno was in the H&P offices on April 18th
> and the reason he was there was to make sure that the money came in and immediately went
> out?
>
> A.  Correct.
>
> Q.  And, in fact, the money came in and within minutes the money went out to K.M.X. and
> Custom?
>
> A.  Correct.

Trial Trans. Day 1 at 100:3-17.

---

[10]

  The Court here speaks of a legal obligation only.  Obviously, MMM did have reason for wanting to
see that Custom and KMX got paid to ensure the MMM Project proceeded, and reaching an agreement with
H&P that would result in such payment was one way to make that happen, though MMM could also have paid
them directly. Indeed, the "letter agreement" that MMM had proposed, but which was never implemented
because of the dispute over liquidated damages, included a provision stating that if MMM reasonably believed
that there was a possibility that H&P would not use the transferred funds to pay Custom and KMX it had the
discretion to  pay them directly and such payment would be considered MMM's performance of obligations
to H&P.

Based on the credible evidence and contrary to the argument put forth by the Plaintiff, H&P's property interest in the funds that it received from MMM on April 18th was thus fundamentally different than was its interest in prior payments from MMM under the MMM Contract that came with no conditions and which allowed H&P total discretion on the use to which they could be put. While H&P may have had bare legal title to the funds transferred to it by MMM on April 18th, under Pennsylvania law the Court finds that it held the funds as a trustee in a resulting trust relationship for the beneficial interest of Custom and KMX.[11]

In so concluding, the Court is guided by the case of *In re Net Pay Sols., Inc.*, 822 F.3d 144 (3d Cir. 2016). In that case the debtor "Net Pay" was a payroll service company that had contracts with employer-clients that gave them the option of authorizing the debtor to access their bank accounts for the purpose of transferring funds into the debtor's account so that the debtor could then remit those funds to employees of the clients, the IRS, and other taxing authorities. The debtor made a pre-petition payment to the IRS from the debtor's account, and the bankruptcy trustee brought a preference action against the IRS. The issue arose whether the payment was a transfer of an interest of the debtor in property. The IRS argued that the funds were being held by the debtor

---

[11] It might be possible, in the alternative, to see H&P as being a bailor in a bailment relationship with MMM, with an obligation to pay the bailed funds to Custom and KMX. "A bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it[.]" *Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970). Any sort of personalty can be the subject of a bailment, including money. *Monarch Capital Corp. v. Bath* (*In re Bath*), 442 B.R. 377, 392 (Bankr. E.D. Pa. 2010). Bailments are similar to trusts, but with the differences that (1) they can only involve personalty while trusts can involve either real or personal property, and (2) a bailor does not obtain legal title, only a right of possession, while a trustee does obtain legal title. It seems more appropriate to analyze the present case under trust law rather than as a bailment since that is more consistent with the Plaintiff having been found to make a preliminary showing by the payments to Custom and KMX coming from H&P's operating account, which implies a recognition that H&P did acquire legal title to the funds transferred to it by MMM.

in a special statutory trust for withheld taxes created by the Internal Revenue Code, and the district

court agreed and found in favor of the IRS on that basis.  On appeal, the Third Circuit affirmed on

this same ground, but it went on to state as follows:

> Although the foregoing resolves this appeal on the same grounds as the District Court, we note that, under Pennsylvania state law, Net Pay would not be entitled to the money at issue even if its interpretation of the minimum threshold and the federal trust provision were correct. Absent federal preemption, we look to state law to determine the nature of a debtor's interest in property....Net Pay's agreements with its customers designate Pennsylvania law as the governing law. Assuming *arguendo* that federal law is silent and that Pennsylvania law does not conflict with federal interests, *we would conclude that the funds were held in a resulting trust (i.e., one implied by the circumstances) under Pennsylvania law*. The Government has produced more than sufficient evidence "showing circumstances which raise an inference that in making the conveyance to [Net Pay], there was no intention [by Net Pay's customers] to give [Net Pay] the beneficial interest in the property." *Mooney v. Greater New Castle Dev. Corp.*, 510 Pa. 516, 510 A.2d 344, 346 (1986). *See also In re Vosburgh's Estate*, 279 Pa. 329, 123 A. 813, 815 (1924) ("[E]very person who receives money to be paid to another or to be applied to a particular purpose is a trustee, if so applied, as well as when not so applied.").

822 F.3d at 158, n.13 (emphasis added).  Having so concluded, the *Net Pay* court went on further

to state:

> And without an equitable interest in the money withdrawn from each client's account, §547(b) does not apply. *See* 11 U.S.C. § 547(b) (requiring the debtor to have an interest in the property in order to avoid a transfer); *Begier*, 496 U.S. at 59, 110 S.Ct. 2258 (observing that "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'").

*Id*.

The relevant circumstances in the present case are the same.  There is no evidence

that, in agreeing to transfer funds to H&P on April 18th, MMM had the intention to give H&P

a beneficial interest in the funds.  Rather, the clear intent was that the funds were being

transferred to  H&P solely to act as a conduit to forward the funds to Custom and KMX, the

actual beneficial interest holders. Pennsylvania law does require for the establishment of a resulting trust evidence that is "clear, direct, precise, and convincing." *Masgai v. Masgai*, 333 A.2d 861, 865 (Pa. 1975). The Court finds that standard has been met. H&P was holding the funds from MMM only as a trustee in a resulting trust,[12] and it thus did not have an equitable interest in the funds. That means the funds were not property of the estate and their transfer to Custom and KMX was not a transfer of an interest of the debtor in property under Section 547(b). *See also* 11 U.S.C. §541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest...becomes property of the estate...only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *Brady v. United States* (*In re Specialty's Café & Bakery, Inc.*), 639 B.R. 548, 554 (Bankr. N.D. Cal. 2022) ("Property held in trust by a debtor for another is neither property of the bankruptcy estate under §541(d), nor property of the debtor for purposes of § 547(b).").

Even if it is assumed for the sake of argument that Pennsylvania law on resulting

---

[12]

Indeed, it might even be possible to conclude that an express trust had been created. Under Pennsylvania law:

> In order for a court to find that a trust has been created, there must exist in the record clear and unambiguous language or conduct evidencing the intent to create a trust. No particular form of words or conduct is required to manifest the intention to create a trust. Such manifestation of intention may be written or spoken words or conduct indicating that settlor intended to create a trust...It is not necessary that the terms 'trust' and 'trustee' should be used. The donor need not say in so many words, 'I declare myself trustee,' but he must do something which is equivalent to it, and use expressions which have that meaning.

*Peters Creek United Presbyterian Church v. Washington Presbytery of Pennsylvania*, 90 A.3d 95, 110 (Pa. Commw. Ct. 2014) (citations omitted). By MMM insisting on how the transferred funds were to be used, and by H&P agreeing to do so, one might infer the creation of an express trust even though the terms "trust" and "trustee" were not present. The Court nevertheless chooses to treat the relationship as a resulting trust in accordance with the teaching of the *Net Pay* decision.

trusts conflicts with an important federal interest, such that federal law governs the "interest of

the debtor in property" inquiry here, the same result would follow. As noted by the *Net Pay*

court, "[f]ederal common law [also] imposes a trust when an entity acts as a conduit, collecting

money from one source and forwarding it to its intended recipient." *See* 822 F.3d at 158 n.13

(quoting *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1056 (3d Cir.1993)).

Based on the unique circumstances of this case and the evidence presented, the

Court thus finds that the April 18th payments made by the Debtor to Custom and KMX, to the

extent they were made with funds transferred to the Debtor by MMM earlier that same date, were

not the transfer of an interest of the debtor in property, and were not preferential. At the same

time, however, it cannot be ignored that $49,695.79 of the transfers that occurred on April 18th

were of an interest of the debtor in property because they came from unrestricted Debtor funds.

There was no evidence presented as to an allocation of that portion of the transfers as between

the two subcontractors, and in all probability H&P gave that question no thought when making

the transfers. Custom received very slightly less than 50% of the total transfer made by H&P,

while KMX received very slightly more than 50%.[13] These are close enough that the Court will

allocate 50% of the $49,695.79 to each such that, after rounding, each is found to have received

a transfer of $24,847.90 on April 18th that was an interest of the Debtor in property.

As was indicated above, the Court is basing its conclusion on a resulting trust,

something not specifically argued by the Defendants. The Defendants did raise an argument

based on the earmarking doctrine, and that doctrine has been likened to a challenge to the claim

---

[13]

The more exact figures are 50.097% for KMX and 49.903% for Custom.

that particular funds are part of the bankruptcy estate.  *Metcalf v. Golden* (*In re Adbox, Inc.*), 488 F.3d 836, 842 (9th Cir.2007).   In other words, the earmarking doctrine rests on a very similar basis as the Court's finding of a resulting trust.   Given that finding, there  is no need for the Court to consider the earmarking doctrine further, and it will not do so except to point out that one of the important elements of that doctrine as expressed by the Third Circuit is that "the transaction viewed as a whole ... does not result in any diminution of the [debtor's] estate." *See Winstar*, 554 F.3d at  400  (quoting *McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen Enters., Ltd.*),859 F.2d 561, 566 (8th Cir.1988)).  The Court finds that element would be met here, because the credible evidence establishes that MMM would never have agreed to transfer the funds to H&P on April 18th without H&P being obligated to immediately pay them over to Custom and KMX. Therefore, the transfer of the funds to Custom and KMX did not diminish the Debtor's estate.[14]

### (B)   Whether Custom and KMX received more than in a Chapter 7

The Court must next determine whether Plaintiff proved that the still-surviving transfers meet the requirements of Section 547(b)(5).  To reiterate, those surviving transfers are the Debtor's  payments to Custom of $15,500 on February 4, 2016 and of $24,847.90 on April 18, 2016, and its payments to KMX of $51,000 on February 12, 2016, of $40,887 on March 11, 2016, and of $24,847.90 on April 18, 2016.  It is the position of the Plaintiff that Custom and

---

[14]

Despite the Defendants' characterization, the Court does not view the payment by MMM as a *gift*. What is clear from the evidence of record is that MMM was certainly motivated to see that funds were delivered to KMX and Custom, whether directly or through H&P,  to enable the Project to proceed regardless of how the parties may seek to characterize the payment after-the-fact.

KMX received nearly 100% of what they were owed with respect to these transfers, and that, as unsecured creditors in a hypothetical Chapter 7, they would have received much less.

The Plaintiff relies principally on a Declaration of Albert's Capital Services, LLC that was submitted as Plaintiff's Exhibit 44 without objection. In that Declaration, Edward T. Albert, II, the president of the Plaintiff, asserts that as of October 30, 2020, unpaid subcontractors of the Debtor with allowed, general unsecured claims in Class 3 had been paid only approximately 28% of their claims through the bankruptcy. Plaintiff takes the position that Custom and KMX were unsecured creditors who would have been in Class 3, and therefore they received more by the prepetition H&P payments than they otherwise would have in this case.[15]

The Defendants respond to this in a number of ways. First, they question the sufficiency of the Declaration to prove they would only have received approximately a 28% payment in a Chapter 7 bankruptcy. They point out that the Declaration is over two years old, and that it fails to say anything about the current amount of unsecured claims or about the money that the Plaintiff has to pay unsecured creditors–both of which are necessary to establish a likely bankruptcy payoff percentage. The Defendants argue that therefore the Court has no ability to conclude what they would have received in a bankruptcy and that Plaintiff has failed to meet its burden of proof with respect to Section 547(b)(5).

The Court agrees with the Defendants to the extent that it would have been preferable from a "best evidence" standpoint to have something more recent than the Declaration to show what Defendants would likely have received in bankruptcy and perhaps to have had that

---

[15] As the confirmed plan is a plan of liquidation, the evidence has been presented as relevant to what Defendants would have received in a hypothetical Chapter 7 case.

done through live testimony.  Even so, however, the Court finds that the Declaration is sufficient to meet the Plaintiff's burden of proof.  The Court may take judicial notice of the docket in the main bankruptcy case.  *See, e.g.*, *Honeywell Int'l, Inc. v. N. Am. Refractories Asbestos Pers. Injury Settlement Tr.* (*In re N. Am. Refractories Co.*), 542 B.R. 350, 365 n.16 (Bankr. W.D. Pa. 2015).  Doing so reveals that there has been no real substantive activity in the bankruptcy case since October 30, 2020, when the Declaration was prepared.  Status and financial reports filed since then indicate that all other claim objection and preference actions were resolved prior to October 30, 2020, leaving the within two preference actions as the only remaining matters to be concluded in the case.  *See, e.g.*, the Status Report filed on January 11, 2021 at Main Case Doc. No. 941.  The 28% payout figure listed in the Declaration remains the same in the most recent Post-Confirmation Report, with the possibility of any further distributions to unsecured creditors dependent solely on the outcome of these two preference actions.  *See* Main Case Doc. No. 968.  Given the reported pool of allowed claims in the case ($3,538,895) and the cumulative payments made on them to date ($1,005,143, or 28%), as reported in the Post-Confirmation Report, the Court finds that the Plaintiff has proven by a preponderance of evidence that the Defendants received more from H&P than they would have through bankruptcy-- assuming they were not fully secured creditors.

That final qualification is made because the second ground on which the Defendants attack Plaintiff's case with respect to Section 547(b)(5) is by arguing that they were, in fact, fully secured creditors.  Custom takes the position that it was secured by an artisan's lien under Florida law that attached to the equipment it fabricated, while KMX asserts it was secured by a warehouse lien under Texas law that attached to the goods being stored in its Houston

28

warehouse. Significantly, however,  the Defendants have also taken the position in the case that

the materials being held by Custom and KMX purportedly subject to these liens  were not owned

by the Debtor.  For instance, in his opening statement at trial, Counsel for the Defendants stated:

> There will be no evidence that any of the – of the property that we're going to discuss in this case was ever in the possession of H&P, the Debtor.  The Debtor did not own and control anything Custom Fabricating (sic) made.  Custom did.  H&P did not own and control the warehouse which K.M.X. rented in Houston.  K.M.X. did.

Trial Trans. Day 1 at 12:19-24.  And later, after noting that H&P had not listed the warehouse

property as an asset in its Schedules, Counsel stated:

> So either H&P did not properly report its assets in its schedules or the property in the [KMX] warehouse wasn't H&P's property.  And we would suggest that the answer is B, the property in the warehouse was not H&P's property, and H&P never claimed ownership of it.

*Id.* at 27: 1-6.

The problem for Defendants with this position, however, and as Plaintiff points out,

is that if H&P did not own the property in question, then the Defendants would not be secured

creditors as against H&P in an H&P bankruptcy, and would thus both be treated as unsecured

creditors. *See, e.g.,* 11 U.S.C. §506(a)(1) ("An allowed claim of a creditor secured by a lien on

property in which the estate has an interest ... is a secured claim to the extent of the value of such

creditor's interest in the estate's interest in such property...."); *In re Boros & Reiss Art Weave Mills,*

*Inc.*, 149 F. Supp. 28, 31 (D.N.J. 1957) ("If the security is the property of someone other than the

bankrupt, then the creditor is not within the . . . definition . . . of a secured creditor....") (citing *Feder*

*v. John Engelhorn & Sons*,  202 F.2d 411, 412 (2d Cir. 1953)); *In re Floyd*, No. 21-10276-SDM,

2021 WL 4944699, at *3 (Bankr. N.D. Miss. Oct. 22, 2021) (where debtor had sold creditor's

collateral prior to bankruptcy, the estate had no interest in the property securing creditor's claim and that resulted in creditor's claim being classified as an allowed unsecured claim).

It is not clear how the Court can determine the ownership issue since neither side has pointed to any relevant evidence or legal authority that might enable it to do so.  At most the Parties have simply made assertions one way or the other on the issue or sought to introduce someone else's opinion on this legal issue.[16]  The one fixed point on which the Court can start is that the property being held by Custom and KMX was not clearly listed as an asset by the Debtor in its Schedules. *See* Main Case,  Doc. No. 60 at Schedule A/B. That is significant because, "'[i]n the absence of contrary proof,' a verified bankruptcy petition is assumed to be 'a true and accurate representation of [the petitioner's] personal property.'" *Neidenbach v. Amica Mut. Ins. Co.*, 842 F.3d 560, 563 (8th Cir. 2016)(quoting *Liberty Mut. Fire Ins. Co. v. Scott*, 486 F.3d 418, 423 (8th Cir. 2007)). Information in a debtor's schedules may be considered admissions. *In re Dispirito*, 371 B.R. 695, 698 (Bankr. D.N.J. 2007); *In re Garberg,* No. 05-19589 SR, 2006 WL 1997415 at *6 (Bankr. E.D. Pa. June 7, 2006). The burden rests with a party objecting to the information to come forward with evidence showing its falsity.  *In re Skiles*, 504 B.R. 871, 881 (Bankr. N.D. Ohio 2014).

Under the facts of this case, therefore, the Court finds that any party seeking  to contravene the implicit assertion in Debtor's Schedules that it was not the owner of the property allegedly subject to liens held by the Defendants  had the burden to come forward with evidence showing that Debtor was in fact the owner. The Plaintiff did not provide such evidence, and the

---

[16]

For instance, following the trial the Defendants moved to introduce into evidence an affidavit from an attorney which reportedly states that she advised the Debtor that it did not own the property in question, a request which the Court denied.

Defendants actually agreed with the position that Debtor was not the owner.  The presumption that

the Debtor was not the owner of the property has not been rebutted. Thus, even assuming the

Defendants did have liens as they contend, such liens were not on property of the Debtor. Therefore,

the Defendants  would not be secured creditors in the H&P bankruptcy.[17] That means, in turn, that

they would be treated as unsecured creditors in the bankruptcy and that they received more in the

prepetition transfers from H&P than they would have in a Chapter 7 bankruptcy.  In short, the

Plaintiff has met its burden under Section 547(b)(5) and established a prima facie case of preference

as to these transfers.  That is not the end of the matter though since Defendants have also raised some

affirmative defenses which are considered in the next section.


   *(C)   Affirmative defenses of the Defendants.*


   The Defendants have raised a number of affirmative defenses to Plaintiff's preference

claims.  Both of the Defendants argue that they have a defense based on the "contemporaneous

exchange for new value" provision of Section 547(c)(1).  Under this provision, a transfer that would

otherwise qualify as preferential may not be avoided to the extent it was intended by the debtor and

creditor to be a contemporaneous exchange for new value, and in fact was a substantially

contemporaneous exchange. The Defendants argue that the transfers of payment they received on

April 18th were intended to be in exchange for their release of the liens they had asserted in the goods

produced by Custom and stored by KMX, that they did release such liens, and that Debtor thereby

---

[17]

   This result means the Court need not consider issues of the validity of the alleged liens, whether such
liens had been waived,  the priority of such liens, and the value of goods subject to such liens.

did receive new value.  As an affirmative defense, Defendants have the burden of proof on this new value defense.  *See* Section 547(g).  The Court finds that Defendants have failed to meet their burden of proof for two reasons.  First, as discussed above, the Court finds that it was not established that the Debtor was the owner of the property on which the Defendants claimed a lien, so the Defendants have not proved that any lien waiver that may have occurred provided new value to the Debtor.  Second, and in any event,  the evidence presented was not sufficient to prove that any lien waiver by the Defendants actually occurred in connection with the April 18th transfers.

The Defendants next argue that at least some of the transfers at issue are protected from recovery as a preference because they were made in the "ordinary course of business" within the meaning of Section 547(c)(2).  Before looking further into this issue, it is important to be clear as to exactly what transfers the Defendants are challenging on this basis. To the extent either Defendant is challenging the portions of the April 18th transfers made from funds in which the Debtor had an interest, based on this record, the Court simply cannot not find these to be in the ordinary course of business. KMX in its post-trial brief does explicitly argue that the payments it received on February 12, 2016 and March 11, 2016 were in the ordinary course of business. Custom's post-trial brief is silent on the February 4, 2016 payment it received, but the Court will err on the side of caution and assume Custom does contend that payment was made in the ordinary course of business.  Thus, the transfers to be considered in connection with this affirmative defense are the payments received by the Defendants in February and March 2016.

Section 547(c)(2) provides:

(c) The trustee may not avoid under this section a transfer–

---

32

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> (B) made according to ordinary business terms[.]

11 U.S.C. §547(c)(2).  The purpose of this ordinary course defense "is to leave undisturbed normal financial relations because it does not detract from the general policy of the preference section to discourage unusual actions by either the debtor or his creditors during the debtor's slide into bankruptcy." *Böhm v. Golden Knitting Mills, Inc.* (*In re Forman Enterprises, Inc.*), 293 B.R. 848, 856 (Bankr. W.D. Pa. 2003) (quoting *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991)). Again, since this is an affirmative defense to what would otherwise be a preference, the Defendants have the burden of proof.

It is generally held that Section 547(c)(2)(A) calls for the application of a subjective test looking to see if the transaction was an ordinary transaction as between the two parties, while the alternative Section 547(c)(2)(B) imposes  an objective test whether the transaction was ordinary in the industry.  *United Concrete Products v. VCW Enterprises, Inc.* (*In re VCW Enterprises, Inc.*), No. 14-4705, 2015 WL 224385, at *4 (E.D. Pa. Jan. 15, 2015). Looking first at the subsection (B) objective test, the Court finds the Defendants failed to meet their burden of proof. "While expert testimony is not necessarily required, a defendant must provide admissible non-hearsay testimony related to industry credit payment, and general business terms in order to support its position." *FBI Wind Down, Inc. Liquidating Tr. v. CareersUSA, Inc.* (*In re FBI Wind Down, Inc.*)*,* 614 B.R. 460, 495 (Bankr.D. Del. 2020).  Where a defendant presents only its own practices without any general industry standards for comparison, it has not met its burden. *Id.*  Here, the Defendants presented no

evidence of general industry standards for payment practices in either the steel fabrication or logistics

industries.  The Court  therefore finds that Defendants have not met their burden of proof as to

Section 547(c)(2)(B).

In considering the subjective test under Section 547(c)(2)(A), no single factor is

conclusive, but courts have looked at such things as the following factors:

> (1) the length of time the parties engaged in the type of dealings at
> issue;
> (2) whether the subject transfers were in an amount more than
> usually paid;
> (3) whether payments at issue were tendered in a manner different
> from previous payments;
> (4) whether there appears to have been an unusual action by the
> debtor or creditor to collect on or pay the debt; and
> (5) whether the creditor did anything to gain an advantage (such as
> additional security) in light of the debtor's deteriorating condition.

*FBI Wind Down,*  614 B.R. at 487.

Plaintiff has persuasively argued why neither Defendant can pass the subjective test

with respect to the payments at issue.  Custom and H&P had not previously done business together;

the MMM Project was the first time they had a business relationship.  The recent origin of the

relationship at the time of the February 4, 2016 transfer –approximately 9 months-- in itself counts

against  an ordinary course defense under the subjective test.  Furthermore, during the entire time

of that relationship, H&P was by its own admission in significant financial distress. There were a

couple of late payments made by H&P in 2015, and then starting in 2016 the lateness of payments

accelerated.  The February 4, 2016 payment–which was itself two weeks late-- was the first payment

made to Custom in 2016, and the only one made that year until the April 18th payment. Thereafter,

a number of additional invoices were issued by Custom during that time period that were all late in

being paid. Additionally, there was unusual action by H&P in connection with the February 4th

34

payment in that it had already by that time required an adjustment of the payment schedule with

MMM in order to stay afloat financially, and a request for additional adjustment was on the close

horizon. Under the subjective test there was no well-established ordinary course of business between

Custom and H&P sufficient to meet Section 547(c)(2).

As for KMX, although it and H&P had previously done business together, their

relationship involved in the present case only began in early 2016, shortly before the February 12,

2016 and March 11, 2016 payments at issue were made. Plaintiff also rightly notes that the prior

dealings between the parties had not gone smoothly from a payment point of view. Internal KMX

e-mails exchanged shortly before KMX reached an agreement with H&P concerning the MMM

Project showed considerable concern over the company's past payment experience with H&P.  In

a January 8, 2016 e-mail to Steve Frank,  Vitez objected to a payment schedule proposed by H&P,

noting that the proposed agreement with H&P on the MMM Project would be a "tough one,"  with

the anticipation of numerous separate  invoices on a 30-day payment which "we know will be

longer" and a "history of payments that is not good."  Plaintiff Exhibit 25 at Bates No. 329. Vitez

asked for the H&P payment history to be "pulled," and in an e-mail from a Ken Hollenbaugh to

Vitez on January 11, 2016, it is recounted that H&P's prior payment history on work done by KMX

for it included a 9-month stretch in 2013-2014 in which KMX did not get paid. *Id.* at Bates No. 326-

29. Reflecting that, the Vitez e-mail of January 11, 2016, indicates that KMX's last project with

H&P had been for $42,000, it took H&P nine months to pay it down to zero, so "we did finance their

last job, but that was not our intention."  *Id.* at Bates No. 324. All of this resulted in the addition of

an 18% interest penalty by KMX should H&P not pay any amount in accordance with the KMX

Contract, a provision accepted by H&P, and something that arguably constituted unusual action and

an advantage to KMX. *Id.* at Bates No. 296-97. In his January 26, 2016 letter to Project Manager

Gary Cairns of H&P, Vitez stated that KMX could not accept the most recent payment dates being

proposed by H&P as he explained that a large percentage of work days had been lost since H&P's

initial proposal and that he anticipated extra costs in excess of the presently negotiated pricing due

to the need for overtime work. *Id.* at Bates Nos. 296-97. The Court further notes that the invoice

paid on February 12, 2016, No. 9706, was not even for any work that had yet been performed but

was a down payment. *See* Joint Stipulation with KMX at ¶¶62-64.

Given all of the above, the Court agrees with Plaintiff that "there was nothing

ordinary about the payments made to KMX in February or March 2016." *See* Plaintiff's Post-Trial

Brief at 20. Quite to the contrary, from the very inception of the contractual relationship between

H&P and KMX concerning the MMM Project, H&P was facing significant financial difficulties, and

KMX was aware of past payment issues on other recent work it had done for H&P. Based on that

knowledge, KMX took steps to protect itself. The Court does not find the existence of "normal

financial relations" between the parties in these circumstances and thus finds that KMX has failed

to meet its burden of proof on the ordinary course of business affirmative defense.

Finally,[18] the Defendants also contend that the Plaintiff failed to conduct a reasonable

due diligence analysis of the claims and the Defendants' affirmative defenses before filing these

cases. The requirement is set forth in the introductory paragraph of Section 547(b), with the relevant

---

[18]

The Defendants also appear to treat their earmarking doctrine argument as an affirmative defense. The Court has addressed that doctrine, *supra*, and would also note that it is not properly classified as an affirmative defense. *See Winstar*, 554 F.3d at 400–01 ("'[E]armarking doctrine is not an affirmative defense..., but rather a challenge to the [plaintiff's] claim that particular funds are part of the bankruptcy estate.' Because the [plaintiff] has the burden of proving the avoidability of a transfer..., 'the [plaintiff] has the burden of establishing [under §547(b)] that property is part of the bankruptcy estate.'")(citations omitted).

language having been added by the Small Business Reorganization Act of 2019, Pub. L. 116-54

(August 23, 2019 with an effective date of February 20, 2020). Both of these adversary cases were

filed well before that effective date, so it is difficult to see how the Plaintiff can be held to a pre-

filing standard that was not yet in existence. *See also, e.g., Cap Call, LLC v. Foster* (*In re Shoot the*

*Moon, LLC*.), 635 B.R. 797, 827 n.104 (Bankr. D. Mont. 2021) (stating that the due diligence

requirement added to Section 547(b) by the 2019 Act was not retroactive regarding pending

preference actions). Even assuming the Plaintiff was under some sort of due diligence standard akin

to the one currently appearing in Section 547(b), the Court would find the standard was met. The

circumstances surrounding the present case before filing, including possible affirmative defenses by

the Defendants, involved many complex legal issues without a clear outcome. The Plaintiff through

its Counsel presented well thought-out and cogent arguments and achieved a partial victory in these

cases. There is no basis for finding any breach of a due diligence standard.

*Conclusion*

The Court finds that Plaintiff has proven preferential transfers were made to Custom

in the amount of $40,347.90, and to KMX in the amount of $116,734.90, and that the Defendants

did not prove any affirmative defenses as to such transfers. The Court finds that all other transfers

involved in the case were not preferential for the reasons stated above. An appropriate judgment

Order will be entered separately.

Dated: <u>February 23, 2023</u>

     <u>/s/ Carlota M. Böhm</u>
Carlota M. Böhm, Judge
United States Bankruptcy Court

Case administrator to serve:
    Scott Hare, Esq.
    Barry Sawtelle, Esq.

FILED
2/23/23 2:07 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA